**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on November 9, 2012**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 14-CR-** |
| | : | **Grand Jury Original** |
| **v.** | : | **Filed Under Seal** |
| | : | **Violations:** |
| **ARREY KINGSLY ETCHI-BANYI, also known as "KINGMAN" and "JOE,"** | : | **18 U.S.C. § 371 (Conspiracy)** |
| | : | **18 U.S.C. § 1347 (Health Care Fraud)** |
| **OYEBOLA HAMMED BABARINDE, also known as "OJ" and "HAM,"** | : | **42 U.S.C. § 1320a-7b (Illegal Payments in Connection with Federal Health Care Programs)** |
| **OYEBISI ZAART BABARINDE,** | : | |
| **OLUWATOYIN BAKARE, also known as "TOYIN," and** | : | **18 U.S.C. § 1028A (Aggravated Identity Theft)** |
| **CECILIA ACQUAH, also known as "CECE,"** | : | **18 U.S.C. § 2 (Aiding and Abetting; Causing an Act to be Done)** |
| **Defendants.** | : | **Forfeiture: 18 U.S.C. § 982(a)(7), 21 U.S.C. § 853(p)** |

## INDICTMENT

The Grand Jury charges that:

## COUNT ONE
**(Conspiracy)**

Unless otherwise indicated, at all relevant times:

### Introduction

1. Medicaid was a health insurance program established by Congress under Title XIX of the Social Security Act of 1965. Medicaid was overseen and administered by the Centers for Medicare and Medicaid Services, an agency within the United States Department of Health

and Human Services ("HHS"). In the District of Columbia, Medicaid ("D.C. Medicaid") was jointly funded by the federal and District of Columbia governments and was administered by the District of Columbia Department of Health Care Finance ("DHCF"). D.C. Medicaid provided health insurance coverage to residents of the District of Columbia whose incomes were below a certain financial threshold as measured against the poverty line. Recipients of medical services covered by D.C. Medicaid were referred to as Medicaid "beneficiaries." D.C. Medicaid was a "health care benefit program" as defined in 18 U.S.C. § 24(b) and a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f).

2. Home care agencies ("HCAs") and nurse staffing agencies ("NSAs") provided home care services, including personal care services, to D.C. Medicaid beneficiaries. Personal care services were intended to assist beneficiaries in performing the activities of daily living, known as "ADLs." ADLs were defined to include the ability to get in and out of bed, bathe, dress, eat out, take medication prescribed for self-administration, and engage in toileting.

3. Personal care services were provided by personal care aides ("PCAs"), who were employed by either an HCA or an NSA, which in turn contracted with the HCA, to provide personal care services to D.C. Medicaid beneficiaries.

4. To be eligible to participate in D.C. Medicaid, HCAs were required to abide by all federal and local laws, regulations, and program manuals governing Medicaid payments. To receive payments from D.C. Medicaid, HCAs were required to submit claims, electronically or in paper form, to DHCF. As part of the claims process, an HCA had to identify certain information related to the provision of services including the name of the D.C. Medicaid beneficiary, the dates of service, the type of service provided to the D.C. beneficiary and the corresponding Medicaid billing code for that service, the length of time a service was provided to

the beneficiary, and the amount of money being claimed for reimbursement from D.C. Medicaid. D.C. Medicaid only paid for services that were deemed medically reasonable and necessary, and that were provided as claimed.

5. To receive personal care services covered by D.C. Medicaid, a beneficiary first had to obtain a prescription from a doctor. This prescription was informally known as an "intake." D.C. Medicaid only reimbursed for personal care services if a doctor determined after a physical examination that the beneficiary had functional limitations in one or more ADLs. The prescribing doctor had to have an expectation that the medical, nursing, and social needs of the beneficiary could be adequately and safely met in the beneficiary's home. Such a determination typically required a medical exam focused on the beneficiary's ability to perform ADLs, as well as questions about the beneficiary's specific living environment and arrangements.

6. After being prescribed an intake, the D.C. Medicaid beneficiary was supposed to provide the intake to an HCA. The HCA then would assign a PCA to the beneficiary and would arrange for a registered nurse to draft a plan of care after performing an initial assessment of the beneficiary's functional status and needs. The plan of care was required to specify the frequency, duration, and expected outcome of the personal care services, and was supposed to be tailored to address the individual needs of the beneficiary. The plan of care had to be approved by a doctor within 30 days of the start of personal care services actually being provided, and had to be re-certified by the doctor at least once every six months thereafter. The plan of care also had to be reviewed by a nurse at least once every 62 days, and updated or modified as needed to address the beneficiary's actual medical needs.

7. Intakes proposed the frequency and duration of PCA visits. A typical intake, translated later into a plan of care, would be for eight hours of personal care services per day for

five days per week, or eight hours per day for seven days per week. In the District of Columbia, over the six-month time span authorized by a single intake or plan of care, D.C. Medicaid could pay approximately $16,952 (eight hours per day with five days per week) or approximately $23,732.80 (eight hours per day with seven days per week) for personal care services provided to one beneficiary.

8. Once the plan of care was written, the HCA was supposed to assign a PCA to provide the personal care services to the D.C. Medicaid beneficiary. Typically, the personal care services were performed in the beneficiary's home. PCAs were required to document the personal care services provided to the beneficiary; this was usually done by completing and submitting a timesheet to the HCA or NSA. The timesheet reflected the amount of time each day that the PCA provided personal care services to the D.C. Medicaid beneficiary and the types of personal care services provided. The timesheet was signed by both the PCA and the beneficiary, and would be presented to the employing HCA or NSA. If the PCA was employed by an NSA, the NSA would forward the PCA's timesheet to the HCA. The timesheet was used by the HCA to submit claims to D.C. Medicaid for payment.

## Individuals and Entities

9. Defendant ARREY KINGSLY ETCHI-BANYI ("**ETCHI-BANYI**"), also known as "Kingman" and "Joe," was the owner of Ultimate Goal Home Care Agency, Inc. ("Ultimate Goal"), an NSA licensed to operate in the District of Columbia. Ultimate Goal had its principal place of business in College Park, Maryland.

10. Ultimate Goal contracted with HCAs to provide PCAs for D.C. Medicaid beneficiaries' personal care services. Since at least in or around 2012, Ultimate Goal caused the HCAs to submit claims for reimbursement to D.C. Medicaid for services allegedly performed by

PCAs who worked for Ultimate Goal. During this same period of time, HCAs paid Ultimate Goal either directly or indirectly through other Nurse Staffing Agencies approximately $2.9 million.

11. Defendant OYEBOLA HAMMED BABARINDE ("**O.BABARINDE**"), also known as "Ham" and "OJ," worked for Ultimate Goal as a PCA purportedly providing personal care services to D.C. Medicaid beneficiaries in the District of Columbia.

12. Defendant OYEBISI ZAART BABARINDE ("**O.Z.BABARINDE**") was the sister of defendant **O.BABARINDE** and was employed by an HCA.

13. Defendant OLUWATOYIN BAKARE ("**BAKARE**"), also known as "Toyin," was an office employee of an HCA, and worked for Ultimate Goal as a PCA purportedly providing personal care services to D.C. Medicaid beneficiaries in the District of Columbia.

14. Defendant CECILIA ACQUAH ("**ACQUAH**"), also known as "Cece," worked for Ultimate Goal as an office manager and as a PCA purportedly providing personal care services to D.C. Medicaid beneficiaries in the District of Columbia.

15. D.C. Medicaid Beneficiaries 1 through 19 were Medicaid beneficiaries in the District of Columbia.

## The Conspiracy

16. From in or around February 2012 through the present, the exact dates being unknown to the Grand Jury, in the District of Columbia and elsewhere, defendants **ETCHI-BANYI, O.BABARINDE, O.Z.BABARINDE, BAKARE,** and **ACQUAH** did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree with others, both known and unknown to the Grand Jury, to commit offenses against the United States, namely:

a. Health care fraud, accomplished by knowingly and willfully executing, and attempting to execute, a scheme to defraud Medicaid, a health care benefit program, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicaid, in the connection with the delivery of and payment for health care benefits, items, and services, in violation of 18 U.S.C. § 1347; and

b. Illegal payments in connection with a Federal health care program, accomplished by knowingly and willfully offering and paying any remuneration, including kickbacks, bribes and rebates, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing and ordering any good, facility, service, and item for which payment may be made in whole and in part under a Federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(2).

Object and Goal of the Conspiracy

17. It was an object and goal of the conspiracy for defendants **ETCHI-BANYI, O.BABARINDE, O.Z.BABARINDE, BAKARE,** and **ACQUAH**, and others, to unlawfully enrich themselves and others, to fraudulently obtain money from Medicaid, and to conceal the scheme.

Manner and Means of the Conspiracy

18. The manner and means by which the defendants and other co-conspirators sought to accomplish the object and goal of the conspiracy included, among others, the following:

a. Defendant **ETCHI-BANYI** recruited D.C. Medicaid beneficiaries who were willing to receive cash payments in exchange for falsely signing timesheets for PCA services that they did not receive.

b. Defendant **ETCHI-BANYI** arranged for and scheduled medical appointments on behalf of D.C. Medicaid beneficiaries to obtain intakes and plans of care to authorize personal care services that would be reimbursed by D.C. Medicaid.

c. Defendant **ETCHI-BANYI** coached D.C. Medicaid beneficiaries to falsely inform doctors and nurses about their medical health to obtain and justify personal care services that would be reimbursed by D.C. Medicaid.

d. Defendant **ACQUAH** and others assisted in managing the day-to-day operations of Ultimate Goal, including aiding defendant **ETCHI-BANYI** in the fraud scheme by checking recruited D.C. Medicaid beneficiaries' D.C. Medicaid identification numbers to confirm their eligibility for PCA services.

e. Defendants **ETCHI-BANYI, O.BABARINDE, O.Z.BABARINDE, BAKARE,** and **ACQUAH** failed to provide D.C. Medicaid beneficiaries with personal care services, and instead paid D.C. Medicaid beneficiaries to sign timesheets falsely certifying that the PCA had provided services as prescribed, when in fact, no services were provided.

f. Defendants **O.BABARINDE, O.Z.BABARINDE, BAKARE,** and **ACQUAH** created timesheets which falsely certified that personal care services were performed for D.C. Medicaid beneficiaries when, in fact, no such services were provided.

g. To create an appearance of legitimacy, defendant **ETCHI-BANYI** hired a field inspector and directed him to make personal visits to D.C. Medicaid beneficiaries and PCAs; when in fact, defendant **ETCHI-BANYI** would undermine HCA field inspections by

calling PCAs and the D.C. Medicaid beneficiaries in advance of a visit to warn them that a field inspector would be arriving on a specific day and ensuring that the PCA and D.C. Medicaid beneficiary were available so it would appear that the services were being provided.

h. Despite regulations requiring that NSAs employ PCAs as wage-earning employees, defendant **ETCHI-BANYI** did not place his workers on his payroll and instead paid them through a combination of non-payroll checks, cash, and pass-through checks from the HCAs.

i. Defendant **ETCHI-BANYI** attempted to conceal the conspiracy by warning D.C. Medicaid beneficiaries against contacting D.C. Medicaid authorities and told the D.C. Medicaid beneficiaries that they, too, engaged in illegal acts by accepting cash in lieu of PCA services.

j. Between in or around February 2012 and in or around October 2013, defendant **ETCHI-BANYI** had discussions with nurses, PCAs, and D.C. Medicaid beneficiaries, among others, about D.C. Medicaid Beneficiaries 1 through 19, who were used to bill D.C. Medicaid at least $498,065.53 for home care services that were not provided.

Overt Acts

19. In furtherance of the conspiracy and to effect the object and goal thereof, defendants **ETCHI-BANYI, O.BABARINDE, O.Z.BABARINDE, BAKARE,** and **ACQUAH**, and other members of the conspiracy, committed the following overt acts, among others, in the District of Columbia and elsewhere:

Activities Regarding D.C. Medicaid Beneficiary 1

a. In or about February or March 2012, defendant **ETCHI-BANYI** told D.C. Medicaid Beneficiary 1, who thereafter became a paid government source, that defendant

**ETCHI-BANYI** would pay D.C. Medicaid Beneficiary 1 $350 per month to sign up for home care services. Defendant **ETCHI-BANYI** further instructed D.C. Medicaid Beneficiary 1 that D.C. Medicaid Beneficiary 1 should tell the authorizing doctor and visiting nurse that D.C. Medicaid Beneficiary 1 was in pain.

b. On or about July 14, 2012, in the District of Columbia, defendant **ETCHI-BANYI** met D.C. Medicaid Beneficiary 1 outside a doctor's office where D.C. Medicaid Beneficiary 1 had gone to obtain a plan of care. Defendant **ETCHI-BANYI** told D.C. Medicaid Beneficiary 1, in the presence of defendant **O.BABARINDE**, that if the doctor authorized the plan of care, "they" would pay defendant **O.BABARINDE** and D.C. Medicaid Beneficiary 1, and that the amount of money paid to D.C. Medicaid Beneficiary 1 would be dependent upon the frequency of PCA services authorized for D.C. Medicaid Beneficiary 1. Defendant **ETCHI-BANYI** paid $10 to D.C. Medicaid Beneficiary 1 for attending the medical appointment.

c. On three occasions between on or about July 6, 2012, and on or about August 24, 2012, in the District of Columbia, defendant **O.BABARINDE** met with D.C. Medicaid Beneficiary 1 to have D.C. Medicaid Beneficiary 1 sign ten timesheets which falsely stated that defendant **O.BABARINDE** had provided D.C. Medicaid Beneficiary 1 with personal care services.

d. From between on or about June 22, 2012, to on or about October 25, 2012, in the District of Columbia, conspirators caused an HCA to submit reimbursement claims to D.C. Medicaid for home care services which falsely claimed that defendant **O.BABARINDE** provided personal care services to D.C. Medicaid Beneficiary 1.

e. On or about August 15, 2012, in the District of Columbia, defendant **O.BABARINDE** met with D.C. Medicaid Beneficiary 1 at a doctor's office and paid D.C.

Medicaid Beneficiary 1 $150 for previously signing timesheets that falsely stated that defendant **O.BABARINDE** had provided D.C. Medicaid Beneficiary 1 with personal care services.

f. On or about October 5, 2012, in the District of Columbia, defendant **O.Z.BABARINDE** met with D.C. Medicaid Beneficiary 1 and paid D.C. Medicaid Beneficiary 1 $100 for previously signing timesheets that falsely stated that defendant **O.BABARINDE** had provided D.C. Medicaid Beneficiary 1 with personal care services.

g. On or about October 12, 2012, in the District of Columbia, defendant **O.Z.BABARINDE** asked D.C. Medicaid Beneficiary 1 to sign timesheets which falsely stated that defendant **O.BABARINDE** had provided D.C. Medicaid Beneficiary 1 with personal care services. When D.C. Medicaid Beneficiary 1 told defendant **O.Z.BABARINDE** that defendant **O.BABARINDE** had not paid D.C. Medicaid Beneficiary 1 as promised, defendant **O.Z.BABARINDE** told D.C. Medicaid Beneficiary 1 that defendants **O.BABARINDE** and **ETCHI-BANYI** had not been dropping off the timesheets regularly.

h. On or about October 22, 2012, in the District of Columbia and elsewhere, D.C. Medicaid Beneficiary 1 told defendant **O.BABARINDE** that defendant **ETCHI-BANYI** had called but had not given D.C. Medicaid Beneficiary 1 the money. Defendant **O.BABARINDE** responded by stating that defendant **ETCHI-BANYI** was the one who was taking the check and that defendant **O.BABARINDE** would follow up with defendant **ETCHI-BANYI**.

i. On or about October 25, 2012, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid for home care services which falsely claimed that defendant **O.BABARINDE** had provided personal care services to D.C. Medicaid Beneficiary 1.

j. On or about November 13, 2012, in the District of Columbia, defendant **ETCHI-BANYI** met with D.C. Medicaid Beneficiary 1 after D.C. Medicaid Beneficiary 1 attended a doctor's appointment and received an intake for home care services that was signed by the doctor. Defendant **ETCHI-BANYI** paid D.C. Medicaid Beneficiary 1 $100 at the meeting.

k. On or about December 20, 2012, in the District of Columbia and elsewhere, D.C. Medicaid Beneficiary 1 spoke with defendant **ETCHI-BANYI** about an upcoming nurse's visit to finalize or recertify a plan of care. Defendant **ETCHI-BANYI** counseled D.C. Medicaid Beneficiary 1 to "just lie on the chair," and to say D.C. Medicaid Beneficiary 1 had "back pain, can't get up from bed," and to "use your cane," even though defendant **ETCHI-BANYI** told D.C. Medicaid Beneficiary 1 that he knew that D.C. Medicaid Beneficiary 1 was "so active and still young." Defendant **ETCHI-BANYI** explained to D.C. Medicaid Beneficiary 1 that "if you don't pretend to the nurse, she may reduce your hours to maybe four or five days."

l. On or about January 29, 2013, in the District of Columbia, D.C. Medicaid Beneficiary 1 met with defendant **BAKARE**, who explained that defendant **BAKARE** was D.C. Medicaid Beneficiary 1's new PCA. Defendant **BAKARE** asked D.C. Medicaid Beneficiary 1 to sign timesheets which falsely stated that defendant **BAKARE** had provided D.C. Medicaid Beneficiary 1 with personal care services. When D.C. Medicaid Beneficiary 1 asked defendant **BAKARE** about getting paid, defendant **BAKARE** replied that defendant **ETCHI-BANYI** had told defendant **BAKARE** that the timesheets required a month before D.C. Medicaid Beneficiary 1 could be paid.

m. From between on or about February 12, 2013, to on or about May 7, 2013, in the District of Columbia, conspirators caused an HCA to submit reimbursement claims to D.C. Medicaid for home care services which falsely claimed that defendant **BAKARE** had provided personal care services to D.C. Medicaid Beneficiary 1.

Activities Regarding D.C. Medicaid Beneficiary 2

n. On or about August 8, 2013, defendant **ETCHI-BANYI** spoke with an individual identified as N.F., who was a D.C. Medicaid beneficiary (hereinafter referred to as "D.C. Medicaid Beneficiary 2"). Defendant **ETCHI-BANYI** warned D.C. Medicaid Beneficiary 2 against contacting D.C. Medicaid, stating, "you don't want your aide to come to your house. You want your aide to bring you some money." Defendant **ETCHI-BANYI** explained, "what you are doing with the aide is plain, it's illegal."

o. On or about August 22, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 2.

Activities Regarding D.C. Medicaid Beneficiary 3

p. On or about September 13, 2013, at approximately 1:24 p.m., defendant **ETCHI-BANYI** spoke with defendant **ACQUAH** about an individual identified as J.D., who was a D.C. Medicaid beneficiary (hereinafter referred to as "D.C. Medicaid Beneficiary 3"). Defendant **ETCHI-BANYI** asked "how many times [defendant **ACQUAH**] had given money to [D.C. Medicaid Beneficiary 3]," and defendant **ACQUAH** replied "the only time [D.C. Medicaid Beneficiary 3] did not get paid was the whole month of July because there were no timesheets for [D.C. Medicaid Beneficiary 3]" and that D.C. Medicaid Beneficiary 3 was paid "$200" the "last three pay periods."

q. On or about September 13, 2013, at approximately 2:03 p.m., defendant **ETCHI-BANYI** again spoke with defendant **ACQUAH** regarding D.C. Medicaid Beneficiary 3 and asked why defendant **ACQUAH** had not paid D.C. Medicaid Beneficiary 3 on "Sunday." Defendant **ACQUAH** responded that D.C. Medicaid Beneficiary 3 was paid "$100" and not paid "in full" because defendant **ACQUAH** did not have time to stop at the ATM. Defendant **ACQUAH** stated "why should [she] give it" when she did not have "timesheets" for D.C. Medicaid Beneficiary 3 to sign.

r. On or about September 25, 2013, at approximately 11:31 a.m., defendant **ACQUAH** told defendant **ETCHI-BANYI** that defendant **ACQUAH** had heard that an HCA's field inspectors were on the way to D.C. Medicaid Beneficiary 3's house. Defendant **ACQUAH** also reported that defendant **ACQUAH** had previously called D.C. Medicaid Beneficiary 3 to instruct D.C. Medicaid Beneficiary 3 to return home and wait for defendant **ACQUAH**'s arrival at D.C. Medicaid Beneficiary 3's house.

s. On or about September 25, 2013, at approximately 11:41 a.m., defendant **ETCHI-BANYI** called D.C. Medicaid Beneficiary 3 to instruct D.C. Medicaid Beneficiary 3 to return home.

t. On or about September 25, 2013, at approximately 4:38 p.m., defendant **ETCHI-BANYI** called D.C. Medicaid Beneficiary 3, who informed defendant **ETCHI-BANYI** that defendant **ACQUAH** was "in the back talking to the guy." When defendant **ACQUAH** took over the conversation, defendant **ETCHI-BANYI** asked defendant **ACQUAH** if D.C. Medicaid Beneficiary 3 "went with [D.C. Medicaid Beneficiary 3's] cane" and expressed approval when defendant **ACQUAH** answered that D.C. Medicaid Beneficiary 3 had. Defendant **ETCHI-BANYI** also told defendant **ACQUAH** to tell D.C. Medicaid Beneficiary 3

that they would be giving D.C. Medicaid Beneficiary 3 $540 for "all the back payment in August and July."

u. On or about October 2, 2013, in the District of Columbia, conspirators caused an HCA to submit reimbursement claims to D.C. Medicaid for home care services which falsely claimed that defendant **ACQUAH** had provided personal care services to D.C. Medicaid Beneficiary 3.

Activities Regarding D.C. Medicaid Beneficiary 4

v. On or about August 17, 2013, defendant **ETCHI-BANYI** spoke with an individual identified as K.M., who was a D.C. Medicaid beneficiary (hereinafter referred to as "D.C. Medicaid Beneficiary 4"). Defendant **ETCHI-BANYI** told D.C. Medicaid Beneficiary 4 that D.C. Medicaid Beneficiary 4 would receive about $400 on Tuesday when the "aides" are paid. Defendant **ETCHI-BANYI** further informed D.C. Medicaid Beneficiary 4 that D.C. Medicaid Beneficiary 4 would be moved to a "new company" because the current "company" was giving them a "hard time."

w. On or about August 17, 2013, D.C. Medicaid Beneficiary 4 instructed defendant **ETCHI-BANYI** to send the money via "MoneyGram" because D.C. Medicaid Beneficiary 4 was presently in "Florida" and would not return until the end of the month. Defendant **ETCHI-BANYI** spoke with D.C. Medicaid Beneficiary 4 about sending the money via "MoneyGram."

x. On or about July 7, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 4.

<u>Activities Regarding D.C. Medicaid Beneficiary 5</u>

y. On August 2, 2013, at approximately 1:05 p.m., defendants **ETCHI-BANYI** and **O.BABARINDE** discussed an individual identified as J.B., a D.C. Medicaid beneficiary who purportedly received eight hours of personal care services from defendant **O.BABARINDE** (hereinafter referred to as "D.C. Medicaid Beneficiary 5"). Defendant **ETCHI-BANYI** instructed defendant **O.BABARINDE** to call D.C. Medicaid Beneficiary 5 to "find out if [D.C. Medicaid Beneficiary 5] was in the hospital. If [D.C. Medicaid Beneficiary 5] was not, then go and give [D.C. Medicaid Beneficiary 5's] money. Two hundred dollars."

z. On or about September 21, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid for home care services which falsely claimed that defendant **O.BABARINDE** had provided personal care services to D.C. Medicaid Beneficiary 5.

<u>Activities Regarding D.C. Medicaid Beneficiary 6</u>

aa. On or about August 8, 2013, defendant **ETCHI-BANYI** called defendant **O.BABARINDE** to provide instructions related to D.C. Medicaid Beneficiary 5 (referred to in paragraphs 52-53, above) and another individual identified as W.W., a D.C. Medicaid beneficiary who purportedly also received eight hours of personal care services from defendant **O.BABARINDE** (hereinafter referred to as "D.C. Medicaid Beneficiary 6"). Defendant **ETCHI-BANYI** instructed defendant **O.BABARINDE** to contact both beneficiaries twice a day to make sure "they are not in the hospital" or "jail" and to notify defendant **ETCHI-BANYI** each time D.C. Medicaid Beneficiary 5 and D.C. Medicaid Beneficiary 6 were called.

bb. On or about August 16, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid for home care services which

falsely claimed that defendant **O.BABARINDE** had provided personal care services to D.C. Medicaid Beneficiary 6.

Activities Regarding D.C. Medicaid Beneficiary 7

cc. On or about August 1, 2013, defendant **ETCHI-BANYI** discussed with P.O.M., a nurse who was responsible for visiting the homes of D.C. Medicaid beneficiaries who purportedly received personal care services, a D.C. Medicaid beneficiary identified as L.W. (hereinafter referred to as "D.C. Medicaid Beneficiary 7"). P.O.M. informed defendant **ETCHI-BANYI** that D.C. Medicaid Beneficiary 7 has not had an "aide for the past month" and the aide "just brought timesheets to sign." P.O.M. told defendant **ETCHI-BANYI** that the aide's failure to see D.C. Medicaid Beneficiary 7 for "one month does not look good . . . does not look correct at all." Defendant **ETCHI-BANYI** responded, "That is not right."

dd. On or about August 6, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 7.

Activities Regarding D.C. Medicaid Beneficiary 8

ee. On or about August 23, 2013, an individual who was identified as P.M. (hereinafter referred to as "D.C. Medicaid Beneficiary 8") contacted defendant **ETCHI-BANYI**. D.C. Medicaid Beneficiary 8 asked defendant **ETCHI-BANYI** "when do [I] get my money [I] have not gotten paid yet."

ff. On or about August 28, 2013, D.C. Medicaid Beneficiary 8 again contacted defendant **ETCHI-BANYI**. D.C. Medicaid Beneficiary 8 reminded defendant **ETCHI-BANYI** that he had "not paid me for this month" and was "tired of having problems

getting my money." D.C. Medicaid Beneficiary 8 further reminded defendant **ETCHI-BANYI** that the "agreement" was to pay D.C. Medicaid Beneficiary 8 "150 ever[y] two weeks."

gg. On or about September 9, 2013, D.C. Medicaid Beneficiary 8 asked defendant **ETCHI-BANYI** what day of this week "do I get my money," and defendant **ETCHI-BANYI** responded "Friday."

hh. On or about September 18, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 8.

Activities Regarding D.C. Medicaid Beneficiary 9

ii. On or about on or about August 1, 2013, P.O.M. spoke with defendant **ETCHI-BANYI** regarding a D.C. Medicaid beneficiary identified as T.T. (hereinafter referred to as "D.C. Medicaid Beneficiary 9"). P.O.M. informed defendant **ETCHI-BANYI** that P.O.M. was unable to see D.C. Medicaid Beneficiary 9 because the aide "keeps making excuse[s]." P.O.M. stated that P.O.M. believed the PCA "did what they usually do . . . promise [beneficiaries] $50 and [beneficiaries] will agree for you not to come. You promise [beneficiaries] $100, you are the best. $150 nobody else can talk to [the beneficiary]." P.O.M. informed defendant **ETCHI-BANYI** that D.C. Medicaid Beneficiary 9 "raced back" when P.O.M. arrived at D.C. Medicaid Beneficiary 9's home unannounced and looked as though D.C. Medicaid Beneficiary 9 "was going to pass out."

jj. On or about September 18, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 9.

Activities Regarding D.C. Medicaid Beneficiary 10

kk. On or about September 11, 2013, P.O.M. spoke with defendant **ETCHI-BANYI** regarding a D.C. Medicaid beneficiary identified as W.W. (hereinafter referred to as "D.C. Medicaid Beneficiary 10"). P.O.M. informed defendant **ETCHI-BANYI** that a home visit for D.C. Medicaid Beneficiary 10 and the PCA was not completed because the PCA "lie[d] to [P.O.M.]" when making an appointment. P.O.M. advised defendant **ETCHI-BANYI** to speak with "his aides" because "this is not how to do it," "pretend" to work and "lie" to P.O.M.

ll. On or about October 3, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 10.

Activities Regarding D.C. Medicaid Beneficiary 11

mm. On or about August 6, 2013, an individual identified as J.K. (hereinafter referred to as "D.C. Medicaid Beneficiary 11") contacted defendant **ETCHI-BANYI**. D.C. Medicaid Beneficiary 11 informed defendant **ETCHI-BANYI** that "your aide came over to see me . . . . Everything is done" and that D.C. Medicaid Beneficiary 11 had "two clients waiting . . . available" to be recruited.

nn. On or about September 13, 2013, defendant **ETCHI-BANYI** spoke with an individual identified as M.M., a PCA employed by Ultimate Goal, and instructed M.M. to "pick[] up his wife's check" and "have her give [D.C. Medicaid Beneficiary 11]" $150 out of "that check." M.M. informed defendant **ETCHI-BANYI** that "[M.M.] had already done so."

oo. On or about September 14, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 11.

Activities Regarding D.C. Medicaid Beneficiary 12

pp. On or about August 8, 2013, defendant **ETCHI-BANYI** instructed an individual identified as K.M. (hereinafter referred to as "D.C. Medicaid Beneficiary 12") not to contact D.C. Medicaid about the status of D.C. Medicaid Beneficiary 12's "extension" to receive additional home care services. Defendant **ETCHI-BANYI** advised D.C. Medicaid Beneficiary 12 not to get "into trouble" by signing more "timesheets" while waiting to receive D.C. Medicaid's approval because D.C. Medicaid Beneficiary 12 did not require the aide "to come to your house [to] help you."

qq. On or about October 3, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 12.

Activities Regarding D.C. Medicaid Beneficiaries 13 and 14

rr. On or about August 21, 2013, defendant **ETCHI-BANYI** spoke with an individual identified as R.M. (hereinafter referred to as "D.C. Medicaid Beneficiary 13") to recruit his "cousin," an individual identified as R.C. (hereinafter referred to as "D.C. Medicaid Beneficiary 14"). Defendant **ETCHI-BANYI** arranged for D.C. Medicaid Beneficiary 13 and D.C. Medicaid Beneficiary 14 to visit a doctor in Silver Spring, Maryland, to obtain an intake or plan of care for "seven days, eight hours" of home care services.

ss. On or about August 28, 2013, defendant **ETCHI-BANYI** spoke to D.C. Medicaid Beneficiary 13 regarding D.C. Medicaid Beneficiary 14. Defendant **ETCHI-BANYI** told D.C. Medicaid Beneficiary 13, "We can't be working like that, okay? You gave me a patient, I paid you for that patient, and I'm unable to see that patient" and "I was supposed to

give your aide your money to come give you today, but I told him I'm not giving you any money because if I can't get in touch with that man, I'm getting back the, the money[.]"

tt. On or about September 7, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 13.

uu. On or about September 9, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 14.

Activities Regarding D.C. Medicaid Beneficiary 15

vv. On or about September 25, 2013, defendant **ETCHI-BANYI** spoke with a PCA identified as C.C. regarding the approval of the "extension" for a D.C. Medicaid beneficiary identified as G.W. (hereinafter referred to as "D.C. Medicaid Beneficiary 15"). Defendant **ETCHI-BANYI** stated that he would add an "extra $200" to the C.C.'s "paycheck" because D.C. Medicaid Beneficiary 15 "was in need of money." C.C. stated that she gave D.C. Medicaid Beneficiary 15 "her own money" during the "last pay period," and defendant **ETCHI-BANYI** responded that C.C. did not have to "pay" D.C. Medicaid Beneficiary 15 until the "next pay period in October" and that C.C. "would get her $200 back."

ww. On or about October 10, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 15.

Activities Regarding D.C. Medicaid Beneficiary 16

xx. On or about September 13, 2013, an unidentified man (hereinafter referred to as "UM 1") spoke with defendant **ETCHI-BANYI** because he "was not suppose to give last

week's timesheet for [Ul]tra" because his "patient," who was identified as K.P. (hereinafter referred to as "D.C. Medicaid Beneficiary 16"), was "in the hospital" and D.C. Medicaid Beneficiary 16 "didn't tell" UM 1 until "[he] took the timesheet for [D.C. Medicaid Beneficiary 16] to sign . . . today."

yy. On or about September 14, 2013, UM 1 informed defendant **ETCHI-BANYI** that D.C. Medicaid Beneficiary 16 "went to the hospital on 09/02/13 and [D.C. Medicaid Beneficiary 16] was discharged on 09/05/13."

zz. On or about October 9, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 16.

Activities Regarding D.C. Medicaid Beneficiary 17

aaa. On or about August 14, 2013, defendant **ETCHI-BANYI** spoke with a PCA identified as E.E. regarding a D.C. Medicaid beneficiary with the initials A.M. (hereinafter referred to as "D.C. Medicaid Beneficiary 17"). E.E. complained to defendant **ETCHI-BANYI** that the money was insufficient to pay D.C. Medicaid Beneficiary 17, who had demanded more money from E.E. E.E. told **ETCHI-BANYI** that E.E. wanted to inform law enforcement about the scheme and provide copies of the paperwork in E.E.'s possession. Defendant **ETCHI-BANYI** advised E.E. against informing law enforcement and that defendant **ETCHI-BANYI** would work to resolve the issue.

bbb. On or about August 27, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 17.

Activities Regarding D.C. Medicaid Beneficiary 18

ccc. On or about September 24, 2013, defendant **ETCHI-BANYI** spoke with P.O.M. regarding an individual identified as W.B. (hereinafter referred to as "D.C. Medicaid Beneficiary 18") because the PCA "has not had a visit in months" and contacted P.O.M. when he learned that D.C. Medicaid Beneficiary 18's phone number was "not good anymore."

ddd. On or about October 9, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 18.

Activities Regarding D.C. Medicaid Beneficiary 19

eee. On or about September 25, 2013, defendant **ACQUAH** purported to provide personal care services to a second D.C. Medicaid beneficiary identified as R.T. (hereinafter referred to as "D.C. Medicaid Beneficiary 19") for approximately 40 hours per week while employed as the "office manager" for Ultimate Goal and while also purporting to provide seven hours of personal care services per day to D.C. Medicaid Beneficiary 3.

fff. On or about October 11, 2013, in the District of Columbia, conspirators caused an HCA to submit a reimbursement claim to D.C. Medicaid which falsely claimed that home care services were provided to D.C. Medicaid Beneficiary 19.

**(Conspiracy, in violation of Title 18, United States Code, Section 371.)**

## COUNT TWO
## (Health Care Fraud)

20. Paragraphs 1 through 15 and 17 through 19 are realleged and incorporated as though fully set forth herein.

21. On or about the dates specified above, in the District of Columbia and elsewhere, defendants **ETCHI-BANYI, O.BABARINDE, O.Z.BABARINDE, BAKARE,** and **ACQUAH**

did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud Medicaid, a health care benefit program as defined in 18 U.S.C. § 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicaid, in connection with the delivery of and payment for health care benefits, items, and services.

**(Health Care Fraud, in violation of Title 18, United States Code, Section 1347, and Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2.)**

**COUNTS THREE THROUGH SEVEN**
**(Illegal Payments in Connection with Federal Health Care Programs)**

22. Paragraphs 1 through 15 and 17 through 19 are realleged and incorporated as though fully set forth herein.

23. On or about the dates specified below, in the District of Columbia, the defendant(s) as specified in Counts 3 through 7 below, did knowingly and willfully offer and pay, and aid and abet and cause to be offered and paid, any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering any good, service, and item for which payment may be made in whole and in part under a Federal health care program as defined in 42 U.S.C. § 1320a-7b(f), that is, Medicaid.

| COUNT | DEFENDANT(S) | APPROXIMATE DATE | APPROXIMATE AMOUNT | OVERT ACT FROM COUNT 1 |
|---|---|---|---|---|
| 3 | ETCHI-BANYI | July 10, 2012 | $10 | Paragraph 19.b. |
| 4 | O.BABARINDE | August 15, 2012 | $150 | Paragraph 19.e. |
| 5 | O.Z.BABARINDE | October 5, 2012 | $100 | Paragraph 19.f. |

| | | | | |
|---|---|---|---|---|
| 6 | ETCHI-BANYI | November 13, 2012 | $100 | Paragraph 19.j. |
| 7 | ETCHI-BANYI and ACQUAH | September 25, 2013 | $540 | Paragraph 19.t. |

**(Illegal Payments in Connection with Federal Health Care Programs, in violation of Title 42, United States Code, Section 1320a-7b(b)(2), and Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2.)**

**COUNT EIGHT**
**(Aggravated Identity Theft)**

24. Paragraphs 1 through 15 and 17 through 19 are realleged and incorporated as though fully set forth herein.

25. On or about June 7, 2013, in the District of Columbia, defendants **ETCHI-BANYI** and **BAKARE** did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person during and in relation to Health Care Fraud, in violation of 18 U.S.C § 1347, by possessing, transferring, and using the names and other means of identification of another person listed in the reimbursement claims submitted to Medicaid, including D.C. Medicaid Beneficiary 1, to execute and attempt to execute a scheme and artifice to defraud Medicaid.

**(Aggravated Identity Theft, in violation of Title 18, United States Code, Section 1028A, and Aiding and Abetting and Causing an Act to Be Done, in violation of Title 18, United States Code, Section 2.)**

**FORFEITURE ALLEGATION**

1. Upon conviction of any of the offenses alleged in Counts One through Seven, the defendants shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. For the offenses in Counts One and Two, the United States will seek a forfeiture money judgment against the defendants in the amount of at least $498,065.53.

For the offenses in Counts Three through Seven, the United States will seek a forfeiture money judgment against the defendants in an amount equal to the value of any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

2. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendants, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

**(Criminal Forfeiture, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 21, United States Code, Section 853(p).)**

A TRUE BILL:

FOREPERSON

Ronald C. Machen Jr. /DLC
ATTORNEY OF THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA